Thank you, good afternoon. We're here for a special sitting for the case of Staten v. Davis and I understand that on behalf of appellant Mr. Newton will be presenting the argument unless we have questions for Mr. James. Okay, you may proceed. Thank you. My name is Jerry Newton and I'll be presenting the argument as it relates to Claim 7. And I'd like to start the argument on the question of deficient performance. And in that respect, I'm going to discuss deficient performance around four gatherings of evidence. The evidence relating to the Eastside Dukes, the blood, the timeline, and the ballistics. Now with respect to the Eastside... Can I back up a moment, please? Excuse me. I'm going to back up a minute because my understanding is that you did argue those things originally. But in the briefs before us, as far as I know, you discussed only the expert witness and the people, the declarations that you said that various things, including that Eastside Dukes came and claimed credit the day after the murder. I don't think you said anything about blood or whatever the last thing was you said. Ballistics. Ballistics. The general allegation here is third-party culpability. And I believe I will be able to could have shown it was somebody else other than Mr. Statton. But did, I think Judge Berzon is asking, did you make an argument in your briefs to us about something like ballistics showing that it was really third-party culpability? No, I'm going to be discussing the evidence that was presented. The problem is that normally we do not We understand that you want to talk about it, but do you agree that ballistics and blood were not discussed in the blue brief? Only in the statement of facts. I mean, I believe we set out the parameters of most of the evidence. The issue for us, though, is normally there has to be a distinct argument made, not just a statement of facts that could potentially support an argument. So if you'll concentrate on the gang and timeline issues. All right. With respect to the gang issue, the testimony of the trial essentially involved Detective David Atkins. Atkins, I thought. Detective Atkins testified as a gangland expert for the prosecution. He came into, as part of the prosecution's case, he said that he was an expert in gangs, that he was familiar with the East Side Dukes, were known to him to be a violent Hispanic gang, that their territory included the area adjacent to where Mr. Statton's parents lived, that he had looked at the graffiti inside the living room, which said ESD for East Side Dukes Kills. That was on a mirror in the living room. He testified that, in his opinion, that graffiti was not authentic, and that, in his opinion, the East Side Dukes did not murder the mother and the father. There was some cross-examination, and there was testimony from the principal or assistant principal saying that it did look genuine. So there was some contrary testimony brought out. That's correct. That was put on in the defense case. And I thought also that some of the friend witnesses also said it looked authentic to them, or one of them did. That's true. But with respect to the deficient performance, the trial attorney was aware that this individual, or someone just like him, from the sheriff's office, was going to be appearing at trial. It's my understanding that Mr. Tyer said later, I think, that he asked for money for a gang expert, and it was denied. Is that correct? My understanding, yes. And I believe it was denied. So then what? What do we do with that? I mean, it sounds like a problem. It doesn't sound at all right that the government should be able to have a gang expert in the defense. It doesn't, but why does it make him an ineffective assistant? He tried. It makes it ineffective assistants because the trial counsel was, I believe, turned down for the gang expert because he didn't make an adequate showing on his 987.9 application. The point really being is there was going to be a gang expert by the prosecution. Right. Trial counsel was aware of that fact. Right. He did not have his own gang expert. And had he done an adequate investigation, had he performed what I believe is a standard of competence under Strickland, he would have found somebody like Dr. Morales. But exactly, is the problem that he didn't tell the trial judge that the government was going to have a gang witness, or is the problem that he should have found a gang witness and put in a declaration from the gang witness saying specifically what he would have said, or what, given that he asked for the money? Well, a problem is that he didn't present an adequate showing, apparently, for the trial judge to give him the money. I don't think the trial judge was the one who had the problem. Well, but here's the point. Knowing that going in, that a gangland expert was going to be essential, he didn't have one. He could have had one. We know he didn't have one. Well, there was no gangland testimony from the defense. We know there wasn't because he didn't get the money to do it. So either he, so we don't know whether he had an actual person. Well, if he didn't get it and he could have gotten it, then that's deficient performance because he should have had an expert in the courtroom to rebut the testimony of Detective Atkins. I mean, that testimony by saying, in my opinion, the Eastside Dukes are not responsible for this murder of the mother and the father, essentially only points the finger directly at the petitioner. I agree with you. That was extremely questionable testimony. But it's just complicated by the fact that he tried to get, did try to do something about it. Well, he attempted to do something. It's sort of like the argument that was being put forward in the other claim involving the Pomona Contract Association. The attorney didn't get second counsel because the court said you didn't make a proper showing. Is that an excuse or does that justify or create a situation where that's not a deficit showing? What was imperfect about the request for a gang expert? What, in your view, should Mr. Tyer have done that he didn't, specifically with respect to requesting money for an expert? He should have indicated to the judge in Department 100 who approves these kinds of expenditures, he should have indicated that the people were going to put on an expert involving the Eastside Dukes. They offered testimony similar to this at the preliminary hearing and that he needed to rebut that. Do we have his application in the record anywhere? It would be in the clerk's transcripts of the 987.9 applications. Can you point to a place in the record? I don't have a specific reference to that right as I'm sitting here or standing here today. You know, we don't have all that much time together, and I would appreciate, unless my colleagues have a different view, of assuming for the purpose of this question that the performance was deficient. I would appreciate your comment on why there was prejudice in view of the evidence that was presented concerning what sounded like confessions by your client and the other evidence that was presented. Well, with respect to confessions by my client, I assume you're referring to the tape. Yes. And in the tape, there are four places where he says, I didn't do it. On page 139 of that transcript, which is in the volume of exhibits attached to the state habeas petition. On page 139, he says, I left to get something to eat. I came back and found my parents. On page 140, he says, I'm telling you because I didn't do it. On page 145, he says, I mean, we ain't did it. I didn't do it. You didn't do it. He's talking to this informant named John Nichols. But there's a lot of other evidence, too. He talked to his friends about killing his parents. He talked about wanting to get money on account of their death. He was seen carrying, I'm bad with numbers, but a .38 revolver with him the day of the killings. And there were portions of that tape that sounded a lot like, I mean, I did it, but I'm going to deny it. So how do we factor that in? Well, I would say you'd have to take a look at the entire body of evidence that was produced at the trial. With respect, for example, to the banter about I'm going to kill my parents, the testimony was that the people who heard this, they were out playing basketball, and they said that they thought it was a joke and that he was laughing. Besides... Laughing can mean more than one thing. Your Honor, he's a 24-year-old boy living at home with his parents. He's never really been in trouble before. He had, I think, a total of 14 witnesses, I put them in a footnote, who talked about his loving relationship with his mother. And his parents had been gone two weeks on vacation. He spends the day cleaning the house, doing the lawn, in anticipation of his parents returning from a two-week vacation. And according to the government, the parents come home at 1140. He shoots them, kills his dad at 1147, and then essentially stabs his mother to death. Now, what doesn't make sense is that he was... There's no record of when he was taken to the police department. He's not under the influence of drugs. He's not under the influence of alcohol. When he comes home and sees the bodies in his house, he runs immediately to the next door. There's no gunshot residue on his hands. And to me, it's a reach to say that because his parents had three-term policies of $100,000 each, that he ambushed them the minute they came home from vacation. That's what you have to buy. And I say that doesn't... Well, it also seemed... You spent a lot of time on other aspects of the timeline, but the part of the timeline that seems most difficult to me is that the parents would have had to... As I understand it, would have had to come into the house sometime around 1143 or something. And the shouting was at 1147, and in that time, they had to carry the suitcases in. The father was apparently changed his shoes or something, and it just... And you have to ask yourself, if he was doing this to kill his parents so he could obtain money, there's a heck of a lot of other ways to do it besides having a massacre in your living room two or three minutes after your parents come home. Now, with respect to... By the way, 10 minutes. Well, the testimony specified that the time of arrival was 1140. Now, I've gone through the timeline, and it's in my brief. Well, I'm not sure I understand your point when you say there are other ways to do it. There are no other ways to get that $300,000, which was a lot of money at the time, to a 24-year-old. So what did you mean when you said there are a lot of other ways to do it? If there was a financial motive to kill his parents to obtain that money, I don't think he would have had a Charles Manson moment in the living room of his house. That's what I meant. I mean, if we subscribe to the idea that he had such cunning that he was going to kill his parents and obtain the $300,000, he could have asked somebody on the East Side Dukes to do it for a couple of thousand maybe. But his parents are just coming home from vacation. There has been no indication of any violence or threats between the petitioner and his parents. You're just saying there might have been another way to kill them, right? Well, sure. Okay. Again, if you're starting with the assumption that he had planned to kill his parents the minute they came home from the vacation, that he was going to shoot his father and stab his mother to death, and that he was going to get the $300,000, then I suppose that would fit. But I'm suggesting that that doesn't really make a whole lot of sense. Can we talk specifically about the declarations from his friends that were submitted in the habeas? Now, first of all, I gather there's an outstanding procedural default question, which hasn't been decided in this case. Is that correct? As to that evidence and how it feeds into the state habeas petitions and their denial. I thought the procedural defaults should have been ruled on. By the California Supreme Court, right? They said there was a procedural default problem, right? Right. And then when this case was in the federal court, I believe the district court denied the procedural default claims. Denied them or just didn't decide them? Well, I believe that the attorney general raised procedural defaults claims, but the summary denial said it's denied on the merits and on timeliness, I believe. But. All right. Well, it's out there, but it hasn't been decided. So our understanding is it hasn't been decided, but it is true the district court decided the merits. So with regard to the, what, four or five declarations from various friends of his, it seems to me that in terms of talking about harmlessness, it is nice to know what we're talking about. So to me, the most relevant evidence was the evidence that he. Well, first of all, there is material in there that would have provided a motive for a lot of what, for the East Side Dukes, i.e. evidence that his father was actually a drug dealer and had gang connections and so on. But the problem there is that there seems to have been a tactical decision to keep at least evidence about DeAndre's involvement. I don't know about his father's. There was a motion in Lemonet and trial counsel made that. Including his father. Including his father. I see. And then there was the evidence about that the East Side Dukes came by the next morning and said, we got them or something like that. And the district court ended up discounting that for reasons that I didn't find terribly persuasive. So the question is, how important could that evidence have been? Well, it could have been very important. First off, it should be noted that you're referring to Robert Osagara, Brian Ellis, and Quincy Murphy. They were all called by trial counsel in the case. He had met with them. He had interviewed them. Ostensibly, he knew that. But they were prepared to testify to that. But he didn't put that into the case. Well, a couple of them said they told him. We don't know whether he... All I know is that he interviewed them. They were trial witnesses. And in the declaration in support of the habeas petition before the California Supreme Court, they came up with this information that the morning after, while the police were still there, the East Side Dukes drove by and three of them said to three of these witnesses, we got him. Well, only one of them testified that that's what was said. There was one who talked about hard stairs. And they had slightly different versions. But only one testified, I think, about, yeah, we got them. I think it was only Mr. Osagura. I think if you check the declaration of Brian Ellis and Quincy Murphy, you'll see the same thing. Taylor does, too. Osagura and Taylor and Ellis, right? All say that? Quincy Murphy, Brian Ellis, and Robert Osagura. Quincy Murphy said he didn't hear anything. He only heard it secondhand. Other people told him that, but he didn't hear anything? I thought more than one of them did say they heard it. I believe when I went through this, there were a total of three witnesses that said that. And I guess as time is getting away from me, I wanted to go back again on the question of deficiency as it relates to the timeline. So I'd like to ask about that because it seems like you have this commercial in the television show and the sound of the gunshots that puts a time on the gunshots very precisely. But I don't really understand why we have any real confidence down to the minute in when they left the party. Can you explain why we think anyone remembered exactly when they left? I can't explain why they remembered it. All I can say is there were two witnesses, and they said they left between 1120 and 1125. And those two witnesses were the sister of the deceased mother, two sisters of the deceased mother. One said it was between 1120 and 1125. Another one said, well, it was around 1123. But if we take either one of those numbers, quite frankly, the more time there is, the better for the prosecution's theory. So if we took 1120. But I just don't, I mean, the commercial is very precise. You can find out when the commercial was on TV. But someone saying it was about 1120, it's just, I mean, it seems like you put a lot of weight in your brief on that memory being exactly right. And your argument sort of falls apart if it was 1115 instead of 1120. And I'm just not sure how realistic it is that the person would remember 1120 instead of 1115. That's the testimony that was elicited by the prosecution. Given that the police officer could do the drive in about that much time anyway, and the likelihood that there could be a few minutes here or there in what people remember, I'm just not sure how strong your timeline argument is. I have trouble understanding how it could be impossible that they could have gotten home. The police officer said he made that drive in 24 minutes. If they left the party at 1120, that would put him arriving at the place of business at 1144. But there's a big difference between the police officer driving in 24 minutes and the defendant's father, who had a blood alcohol content of 0.126. Or he might go faster. I would assume that you would drive slower. Well, he were not drunk. And that's one of the areas where I thought there was deficient performance because he could have gotten a toxicologist and someone to explain the effect of alcohol on driving. Either way you look at it, that's 28.4 miles. And it makes more sense, what the petitioner said, that at 1201 his aunt called at 1201 and said, Are they home yet? And he said, Not yet. He said they got home about 1210 to 1215. And the aunt called again at 1231 and said, Are they home? And he said, Yes, they're home. And then he left. Now, I only have six minutes left. You may save that for rebuttal if you'd like. Thank you. Good afternoon. Scott Tarl from the Attorney General for the appellee. I read the briefing and the record the same way that it seems that the court does in terms of what the pieces of evidence are that are at issue, at least in the briefing. And those are the statement by the passersby in the car and the gang expert's declaration. And regarding neither of those two pieces of evidence can state and show either deficient performance or prejudice. Regarding the statements from the unknown passersby in the car, first off- Well, they weren't unknown. I mean, all these people lived in the area. And they said they were Eastside Dukes. And, of course, there's been no hearing, so nobody got to ask them why they, how they knew they were Eastside Dukes. But although it's been paraphrased as saying they believed they were Eastside Dukes, that's not what they said. They said they were Eastside Dukes. That's correct. So they may be unknown to us, and they may even have been unknown to them, but they may well recognize them, and they were quite definitive about it. So I don't really understand why we're acting as if there's something unclear. I mean, it's unclear because we haven't had an evidentiary hearing, but they said they knew they were Eastside Dukes. That's correct, Your Honor. The declaration said they were Eastside Dukes. The reason why it's significant that we don't know anything more than that, like a nickname or a name or a description or anything like that, is that in order for these statements to have been admissible somehow, you would have to have more of a foundation than that. Well, that's right. But this is a – the real question is should there be an evidentiary hearing on this question? Who were they? How did they know who they were? Did they know who they were? We have no idea. But the burden in the state court, which is what we're looking at under 2254 D1, was on Petitioner, was on Staton. Correct. To produce declarations that would show that he's got something and to show that because this is ineffective assistance of counsel, not only to show that there is somebody claiming credit supposedly, but to show that there was something here that any reasonable attorney should have put on and that the failure to do so would have been deficient. And when the statement like, yeah, we got them, offered to prove the truth of yeah, we, meaning my gang, the East Side Dukes, if we will indulge that presumption, got them would be hearsay. It would be without foundation. There would be – it would not meet any kind of exception. It's furthermore speculative, vague, and ambiguous. I think it would have, if not – It's not ambiguous. Well, it is in the sense of who are they that we got, I suppose, too. But they were a friend of the House. Well, Your Honor, I would also say that it was ambiguous in terms of we don't know for a fact they were referring to the Staton murders. We don't know for a fact that they didn't see a lot of police commotion on a corner and decide to drive by and say, yeah, we got them. We don't know all of these things. And in terms of whether an evidentiary hearing should have been granted, we have to look at what petitioner, what Staton, proffered. And theoretically, I don't know if he could have proffered more or not, but all that he got were five declarants, two of them who – Sorry, Your Honor. See, you don't think it would be admissible if that – say it was fleshed out somewhat more. We've seen that car before. We know it belongs to East Bay Dukes. I don't know the guy's name, but I know he's an East Bay Duke. And this is the kind of thing they do. And I know what they said, and from what they said, I understood what they meant. And you don't think that's admissible just as the graffiti would be admissible, i.e., that somebody was claiming credit for this crime? And that doesn't mean they did the crime, but it's at least some indication that the gang had something to do with this or at least was interested in it. Well, it's more – I would say it's more than graffiti. That's sort of leaving your calling card. It's more – it's a statement, and it's being offered to prove its truth, and you need to show trustworthiness, and you can't show trustworthiness on a record like this. But regardless, for many of the – Do we have any indication that the lawyer investigated this claim, that the drive-by bragging had happened? I mean, maybe we would know more if he had investigated it. Well, what we do know from petitioner's declarations from these five people – well, only three of them heard it – but from these people and from Mr. Tyers that he interviewed all of them. And several of the – But then the declarants say he didn't seem interested in when we were telling him about this bragging. The declarants said that they told – they also said that they told the detectives. I'm not sure whether it was in the murder books. I have not checked, but I would assume the murder books would have – the murder books, meaning the compilation of all the police reports, would have been produced to the defense counsel in discovery, too. I won't speculate about whether he had it, but I think that all of this – Wait, I'm not sure I understand your point about the murder books. What are you saying? Oh, that would be another way that trial counsel would have had the information anyway. And I don't know about – About the declarant saying this, you mean? Or what do you mean he would have known? Because the declarants mentioned in their declaration that they also told Detective Roberts, I believe it was, all of this. Well, his declaration, Tyre's declaration, actually doesn't deny that. He says, I was never told about numerous confrontations between the East Side Dukes and the Stantons, or that the Dukes had a strong motive for wanting to kill the Stantons because both DeAndre and Ray were competing with them. But he doesn't say – and this was after the declaration – that he wasn't told that. Correct, Your Honor. He doesn't mention that. And I believe that that piece of evidence, even assuming it did come in, a statement of this nature would not explain or deny or in any way prevail over the mountain of evidence that pointed to DeAndre's statement. Would you turn to that and talk about prejudice? Yes, yes, Your Honor. When you first look at the evidentiary picture from the prosecution, we have the fact that the murders involved a .38-caliber revolver, that the Stantons owned a .38-caliber revolver. The Stantons kept that .38-caliber revolver in the beauty shop they owned. And I believe within a week before the murders, Stanton goes to that beauty shop, retrieves that .38-caliber revolver. On the night, on the very evening leading up to the murders, Stanton has that .38-caliber revolver. He's at various times holding it and pulling it in his waistband in the house where the murders occurred. He says he didn't, but other people say he did. Other people say that he did. And then after the murders, that gun is nowhere to be seen. It's disappeared. The only piece of evidence we even have that could possibly explain where that gun went is the statement that the court has referred to as the confession to Nichols about having gotten rid of it. But he said he got rid of it before his parents came home. That's what he said. He said, because I don't recall that he said he got rid of the gun before his parents came home. That's what he said, very specifically. In the conversation with Nichols that was recorded. I'm sorry, I don't recall reading it that way. But on top of that, we have his palm print underneath the graffiti, the fact that there was no signs of forcible entry on any of the gates, the blood evidence, the, hold me, excuse me, Your Honor. We have the fact that the spray paint was the same type that matched the type of spray paint that was found in the closet in the Staton's house. The fact that Staton was wearing blue jeans that night, that evening, and it was something that he customarily wore often, and blue jeans were never found again in the house. They searched thoroughly for blue jeans. They never found a pair that would fit DeAndre. His statements that were mentioned here to friends and family members about, or friends of family members, about killing his parents. There was more than just that one incident while playing basketball. He also told family friend Elizabeth Watts about how he would take his father out and that his mother would never hit him again. And he also had told her repeatedly about being upset at his parents, plural. There was the timing of the phone call from the aunt after midnight when the neighbors heard gunshots before midnight, and the exact time that they heard it, whether, the exact time that they heard it, there's perhaps some wiggle room, but they heard it before midnight. They heard it during the nightline broadcast that ended at midnight, and they distinctively heard one gunshot, pause, and then two. And that exactly fits the way into the prosecution theory it would have happened. The phone call part of this didn't entirely make sense to me, because I guess the state's theory is that at the first phone call from the aunt, the parents were already dead, but he says they're not home yet, and I'm about to go out, and then on the second phone call he says they're home, and they're still dead. That's essentially the theory? Yes. So I don't really understand on that theory why he would have answered the phone the second time. It doesn't really make sense, right? Like if he had actually just done this murder and he told the aunt he was going out, wouldn't he just not answer the phone the second time? I don't understand that. People don't always do sensible things, especially in the heat of pressure. They have just murdered something. There are things that he did that don't make sense. I think, though, that not that they don't make sense in terms of that he didn't do it, but that if somebody had the hindsight, 20-20, to really think and plan. But the odd thing about that second call when he said they are home is he never offered to put them on the phone, even though that's normally what he would have done, according to the aunt. Something sounded strange to the aunt even in that. The fact, again, there's no forcible entry. The palm print, the blood, all of that, the gun, the statements, and specifically the statement, I'm still going to blame it on the Dukes. All of that evidence. And then let's look at the gang evidence and a gang expert. The fact that a gang expert, much of the declaration of Dr. Armando Morales would not have been admissible. There are some things a gang expert would have been allowed to testify to. His testimony, while questionable in declaration, was pretty much parallel to Watkins. Watkins did pretty much the same thing. He looked at all the evidence and he said, I think this wasn't a gang murder, including contested evidence. So I don't think either of them necessarily should be able to do this, but Watkins was allowed to. Exactly, Your Honor. And about Sergeant David Watkins. Exactly what? Well, about Sergeant David Watkins, the interesting thing is that even though Tyer didn't get to call his own defense expert, he was able to accomplish much of what would have been admissible from a defense expert through his effective cross-examination of Watkins. But that's a different argument. I have the same question as Judge Berzon about if the judge allowed Watkins, why wouldn't the judge have allowed someone like Morales? It seems like if the judge is allowing this, he'd allow it for both sides. Your Honor, I don't, and I was referring to prejudice there, but, Your Honor, I don't know why the trial court that is denied the request for an expert. The fact is we don't have that denial order as far as I can see. But when you say it would have been inadmissible, it doesn't seem like this trial judge thought this kind of testimony was inadmissible. Oh, I don't mean overall a gang expert at all would not have been admissible. I meant that much of the things that are in the declaration of Dr. Morales wouldn't have been admissible. But what's the type of stuff in Morales' declaration that wasn't also in the state's expert's testimony? Actually, what I would argue is that a lot of it was in the state expert's testimony in a manner that Tyre was able to elicit favorably to the defense. For example, regarding the graffiti, although he testified about how Hispanic gangs typically use straight lines and angular lines in their graffiti on cross-examination, Tyre took him step by step. He showed him photo exemplars of genuine East Side Dukes graffiti or things that Watkins admitted were genuine with curved letters and got him to admit, no, no, sometimes, yes, they can use curved letters. And he got him to go step by step, letter by letter, through the graffiti that was found in the living room. And with each particular letter, except for the first and last, he said there was nothing about the way that letter was formed that tells me this was not genuine gang graffiti. And the same thing with the type of paint. He got him to admit that he would expect that a gang member who's broken into a house, murdered people in the house, and is in a real hurry to get in and out of there might not write in the same way that somebody would write in six-foot-high letters on a big wall in a neighborhood. So what is your recollection of what the record shows about the reason for the denial of the gang expert and the application for the money? My recollection is nothing because I could not find either. The thing that I found was the declaration from trial counsel stating he requested an expert and that was denied. And the actual request is not in there. So we don't know whether it was good, bad, or indifferent. Right. It sounds like it would have been an incomplete record, but I've not seen it. It might be there. I might have overlooked it. I searched through it. I didn't see the specific request for a gang expert in those other various requests. But overall, Tyer's cross-examination of Sergeant David Watkins was very effective. And one very key point that he got him to actually flip on was that he testified on recross that initially, when he was given the case, he believed this was a gang-related crime. On direct, he testified. Actually, he testified, I think, I never believed it was. But then he got him to acknowledge, no, no, actually, when I first got this case, I believed it was a gang crime. And what that tells me is that when he read the initial reports, crime scene, things like that, the people's gang expert is testifying that nothing from that ruled out it being a gang murder to him. And the reason that's significant is what it shows to me is, given all of the other gang evidence that the defense was able to present, both in the defense case and in the people's case, combined with all of that, that the reason the third-party culpability defense was likely rejected by the jury wasn't because they were impressed that the East Side Dukes could not possibly have committed a crime of this nature, but that the East Side Dukes didn't commit this crime because all of that other evidence pointed so strongly to DeAndre Staten. And that, I believe, is the reason that Sergeant Watkins, also, who initially believed this could be a gang-related crime, eventually dropped that because of all of the evidence that said, regardless of whether the gang could very well have committed this, they didn't because all of this evidence pointed to DeAndre Staten. There were a few points I wanted to be sure to share. Could you speak to what you understand to be the status of the procedural default arguments in this case? Yes, yes. The district court did not rule. The district court noted that we raised them and decided it's more expedient to deny on the merits under 2254 D-1 and expressly said, I'm doing that, I'm not ruling on the procedural bars. Would there be Martinez issues? Is that a reason for not doing it? I mean, we are talking about trial counsel IAC here. Was it raised by the habeas, the original habeas lawyers? Were these issues raised? I believe the issues about third-party culpability, I believe that was the... Well, these particular issues, were these particular declarations. Yes, yes, about seeing the drive-by statement and all of that. I believe that was the initial state habeas who was also the direct appeal attorney, Jonathan Milberg. I might be wrong. And that first state habeas petition wasn't filed until quite some time after the briefing on the appeal. As a matter of fact, if I recall, there was a substantial delay and that would have been... Would it be more efficient at this point for us to have briefing on the procedural default? Because otherwise we could be just spinning wheels. I would be happy to do so, Your Honor. It was beyond the certificate so far, but I would be... Actually, I did brief... You did brief it a little bit. I mean, you said it was there. I briefed it. Right, I wanted to acknowledge that argument as well. If the court needs further briefing on that, then yes. Was it briefed in the district court at all, do you know? Yes. Yes, we raised it. It was briefed. Raised it, but was it... I mean, these are complicated questions ordinarily. Yes. Was it raised, was it litigated or at least argued in any detail? I don't recall. I understand that the California Court of Appeals decided these questions in part on default grounds, some of them. I don't know about this one. And, but I don't know, you know, there are all kinds of issues about the adequacy of the various provisions and so on. Was all of that litigated? I don't believe beyond arguing, you know, full-length written legal arguing, but I don't recall that there would be a hearing on things like how frequently this was invoked or not invoked, things of that nature. Would you like to just check my notes? No, on the harmlessness question, to go back to it. Sure. We're talking strickland prejudice, I guess, really, not harmlessness as such, which is a little more forgiving, perhaps. And the, I mean, what strikes me about this case is that I've now sat in a lot of capital cases, and I would say that the guilt phase issues here, or at least the strength of the evidence is not, we always see the phrase overwhelming. It's certainly not overwhelming. It is at least debatable. If the jury had come out the opposite way, I don't know if anybody would have been all that surprised. So in that context, what do we do with the prejudice question? I.e., on a scale of what we usually see, a relatively weak guilt case by the government, in my view. I would respectfully disagree with the characterization of how strong the case was. Relatively. I'm saying relatively. And, right. And I would disagree with that, too. I think this was a very tight case, but regardless, obviously, the court has indicated differently how I would approach prejudice if the court had. You have no, I mean, there's no forensic evidence. All this blood evidence is, it could be him, but nothing that says it was him. I guess this was 1990, and maybe the DNA evidence wasn't sufficient, and I gather no one's going back to do it again, which might be interesting. But, I'm sorry, what? Just as a point of clarification, there was DNA testing done at the time. It was fairly novel, and I don't know that it was advanced as what we have now, but DNA testing was done at the time, and then a stipulation was reached between the two parties, and I think that was because. . . Well, because the DNA testing, as I understand it, was not at the point where it could be specific to an individual. It was specific down to 5 percent or something. Right, and it was like 4 to 6 percent of the African-American community. But because of that, the parties stipulated. . . But an interesting thing about the DNA and the blood is that DeAndre Staton took the witness stand and then admitted that he cut himself earlier that day in blood around the house running around trying to get a Band-Aid. Counsel, let me go back, though, to this question of the standard of review, which I think is what Judge Berzon was getting at. We are reviewing what the California Supreme Court did, correct? Yes, yes. So the question is whether its conclusion that there was no prejudice under Strickland is unreasonable. Correct, that's the standard. So that's the lens that we're supposed to use. And it would be unreasonable, I guess, if the evidence of guilt were thin in comparison to what could have been presented. I think that in comparison of what could have been presented, the key to this, and maybe this answers Judge Berzon's question, the key to the prejudice analysis would be looking at these pieces of evidence and looking at the big picture of the trial evidence that actually was and just seeing would these pieces of evidence, viewed together even, have made the difference, a reasonable probability, but then through the layer of the AEDPA. Could a fair-minded jurist, the Supreme Court, the California Supreme Court, have found that these pieces of evidence, when viewed in comparison to all that was presented, there is not a reasonable probability of a more favorable verdict? Well, Mr. Morales, for example, I must say, had an incredibly impressive resume in terms of his knowledge of these gangs. Now, again, I don't think the form of his declaration was a little peculiar, but it wasn't all that different from what Watkins actually testified to in terms of structure. But he certainly, as between the two of them, who knew more about these gangs, he probably did in terms of, or at least he didn't know less, so he was pretty knowledgeable. But what essentially Dr. Morales or somebody like him could have testified to for the defense is simply in the areas of could a crime like this have been committed by the East Side Dukes, not was it committed by them? That's true, but Watkins said no, and I would assume that was pretty important to the jury. You don't think so? But when he said no, I mean, but then he admitted later that this was the kind of crime. I believe that the impression the jury came away with was no because all of this other evidence shows that DeAndre Staten was the killer, not no because there's no way that— No, but that's like the bottom line the jury is supposed to find. I mean, I don't really understand how that's gang expert testimony at all. Then it would not have been for Dr. Morales. But we do have in the context of gang enhancements and other types of crimes, we have opinions on whether a crime was likely committed for the benefit of the gang, similar to things like that. I don't recall that he went to the ultimate question and said, no, DeAndre Staten committed this murder, not the gang. I could— Well, he did say that the Eastside Dukes didn't conclusively. I mean, he got a hypothetical, which was exactly this case, and he said they didn't. Right, and I— And he said that they don't—I mean, he said things like they don't go into people's houses when they're there, and if they had seen them, they would have backed out, they would have left, and they—I mean, a whole bunch of things. That just seems incredible that he could actually know any of it. But he was allowed to say it all in a lay jury, and he's, you know, had 26 years or something experience with this gang, and he was certainly presented as somebody who could know all this. But then on cross-examination, he admitted, no, gang members do sometimes commit burglaries. They do sometimes go to a targeted person and lie in wait in their house and attack them there, or if they're committing— No, he said that he would have called them outside or that—I mean, he— Well, on— I read him saying definitively they don't do a crime like this one, unless he said, and this is why the declarations are interesting, unless it's a gang person that they have a problem with. And, of course, the hole here is that the declarations say that actually it was the father, at least. But—and then we have the fact that the trial lawyer did seem to know that and made a decision not to catch the case that way. First of all, the trial evidence also did show that the East Side Dukes made specific threats against DeAndre Staton and his friend Nichols, who they even pointed a gun against to Nichols, who frequented that house during those two weeks. But about that motive, I believe that it was a very reasonable tactical decision. At least the California Supreme Court could reasonably find it was a reasonable tactical decision when you're trying a death penalty case not to tell the jury, the first thing you need to know about my client is he's a drug dealer who associates with gang members. Well, it sounds—it sounds—it's probably sufficiently reasonable. But, in fact, if he and his father were in fact at odds with this gang, and, in fact, as Watkins testified, the only circumstances in which they would do a crime like this is if they were at odds with the gang, then it wasn't such a good tactical decision. But I understand what you're saying. And there was evidence that they were at odds with the gang because the gang had threatened them. And Tyer got Sergeant Watkins to testify in cross-examination that he would expect that if the gang threatened to get someone, that they would then follow up and try to do it. Overall, also, had he presented evidence of drug dealing by Mr. Staton, that would have undermined his penalty phase strategy. And he had to know that that was a real possibility. We often see cases reversed for ineffective assistance of penalty phase, and we don't see that here. Overall, I don't know if my time is running short. You have two and a half minutes on the clock, but it's up to Judge Graber. Go ahead. Then I would sum up by saying that the California Supreme Court was reasonable in rejecting both prongs or either prong of Strickland on this ineffective assistance of counsel claim and that this court should affirm. Thank you, Your Honor. Thank you. You have several minutes of rebuttal time remaining. Thank you, Your Honor. Counsel made reference to the DNA testing. That is outside the record. There was never any evidence in the record that any DNA testing had ever taken place. What happened is Valerie Scherer testified. There were 13 blood samples. She examined the 13 blood samples and came up with an opinion as to six. The opinion was all the same. It's not the father. It could be either the mother or the petitioner. A stipulation, the blood was sent, as counsel says, but that information was not put in the record. What happened was the district attorney proposed a stipulation. It's on page 2180 of Volume 12. And he says in the stipulation, the parties stipulate that the blood was sent to another company. And here's what they came back with. It basically is all inconclusive, though. I'm not sure I understand what point you're trying to make with this. How does this help you? Well, it would help if you were to compare it to the testimony of the criminologist with the results of that stipulation. They're completely inconsistent. More importantly, the blood samples that were taken were the mother was found in the. . . Wait, you're trying to argue that it's an effective assistance that he agreed to the stipulation? I didn't make that argument in my brief. Well, I'm not really sure where this gets you altogether, because I do think that counsel correctly stated that your client said, well, I cut myself, so my blood might have been around the house. So there was essentially an admission that it could have been his blood, maybe. So what difference does all the rest of this make? It could have been an Eastside Duke blood. It could have been anybody's blood. And one of your honors mentioned, wouldn't it be nice to have the results of the DNA testing of that blood? We'd love it. If we ever got a remand back to the district court, we would love to have that blood retested by current DNA analysis. But this is part of the. . . I thought that there is a procedure in California for doing that. Excuse me? I thought there is a procedure in California for doing that. There is a procedure, I believe, in the state courts. That's what I just said, in California. That's California, a state. Well, I was referring to if there were to be a remand here for further proceedings. Yes, but what I'm saying is if you wanted to do it, it might be a good idea to do it. You're probably right. Or try to do it. I mean, there's a lot of procedural obstacles, but there is a procedure. All right. I also don't understand where we are with the procedural default arguments in this case because it does seem that the state raised the procedural default problems in its brief, and I didn't notice you responding. And so now I wonder if we also have a waiver of a response. What do you think we can do with the fact that there is a procedural default ruling by the state court and the state has raised it and I think you haven't responded? This case has gone on for 20 years, Your Honor. I believe we litigated and we briefed the procedural default, and I believe when the case was still before the court of Judge King, he ruled. And I believe that he denied the procedural defaults. But I don't have that information at my fingertips. Because it seems that if there's a procedural default problem, I mean, I know you're trying to seek an evidentiary hearing, but it might be easier to resolve the procedural default questions, or maybe they should be resolved before any evidentiary hearing anyway. I get a little turned around about where we are procedurally. If this is, I mean, I would be willing by letter brief or whatever to go back through the record and see if I could find where Judge King ruled. My recollection is he did rule on the procedural defaults. It was raised at the very beginning. But, I mean, even if he did, it seems like now this, well, I guess the state didn't. I mean, they've argued it in their brief now as a problem that's a live problem. So, I mean, even if the district court at some point made a ruling, I'm not sure we can just assume it was correct. Judge Fitzgerald made reference to it in his opinion. And what was his reference? I thought his reference was that he's just going to skip it. That's the reference I'm referring to. Right. So he didn't think it was decided. He just thought it was more efficient to go on with that. I believe that's true. So then what's the relevance? But if you can find that it was at some point decided, it would be interesting to know it. But we're certainly assuming it wasn't. Well, I... So, yes, let us know if you can find it. If I do, I'll send... And maybe you should let us know if you can't find it, too. I'll check the record and I'll send. If it's okay with the court, I'll send by way of a letter of reference. We may... Why don't counsel for both sides await something from the court? We'll figure out what we want to know so that you aren't working at cross-purposes or not answering the things that we ultimately want to know. We'll let you know what we want. All right. The other response... I was going to go seriatim through various things that the Attorney General said, but, quite frankly, I've got 39 seconds left, and I think it's time for me to sit down. Thank you, counsel. We appreciate the arguments from both counsel. And the case just argued is submitted. We'll stand adjourned. All rise. The court for this session stands adjourned.
judges: Graber, Berzon, Friedland